UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. _____

TBC CORPORATION,

      PLAINTIFF,

vs.

GECKOBYTE.COM, INC. D/B/A FITMENT
GROUP; RFH, FORMERLY "RTM
MARKETING GROUP",

      DEFENDANTS.

_____

## VERIFIED COMPLAINT

COMES NOW, Plaintiff TBC Corporation ("TBC"), through its undersigned attorneys, and pleads for its Verified Complaint against Defendants Geckobyte.com d/b/a Fitment Group ("Fitment") and RFH, formerly "RTM Marketing Group" ("RTM") (collectively, "Defendants") as follows:

## Nature of Action

1.    This is a diversity action, brought by TBC against Fitment and RTM to prevent the catastrophic impact Defendants' breach of contract will have on TBC's business operations and the operations of TBC's subsidiaries, franchisees, and their customers.  Pending a final determination in this action, TBC seeks a temporary restraining order and preliminary injunction preventing Defendants from terminating TBC's access to a suite of software tools ("Category Management Tool") developed by RTM and TBC for TBC's exclusive benefit.  Defendants have threatened to terminate access to the Category Management Tool on August 1, 2012 if TBC does

not accede to Fitment's unilateral demand to renegotiate the parties' existing agreement, which is in force through April 30, 2013.

## Parties

2.      Plaintiff, TBC Corporation, ("**TBC**") is a Delaware corporation with its principal place of business at 4300 TBC Way, Palm Beach Gardens, FL 33410.  TBC is the nation's largest vertically integrated marketer of tires for the automotive replacement market.  TBC conducts business in the State of Florida as TBC Corporation d/b/a TBC – Tire & Battery Corporation. TBC consists of a number of operational divisions and wholly-owned subsidiaries, including: TBC Private Brands division ("**TBC Private Brands**"), which manufactures and distributes TBC's private brand tires sold to wholesalers throughout the United States, Canada, and Mexico, including brands such as Multi-Mile, Cordovan, Sigma, Vanderbilt, Sumimoto, Eldorado, Laramie, Telstar, and Jetzon; subsidiary TBC Retail Group, Inc. ("**TBC Retail**"), which is incorporated under the laws of Florida and operates more than 730 company-owned tire and automotive service centers under the brands Tire Kingdom, NTB-National Tire and Battery, and Merchant's Tire and Auto Centers, and almost 500 Big O Tires franchises; subsidiary Carroll's LLC ("**Carroll Tire**"), a Georgia limited liability company which, with National Tire Warehouse, supply products to over 10,000 independent tire dealers across the United States; subsidiary Big O Tires, LLC ("**Big O**"), a Nevada limited liability company and North America's largest retail tire franchisor with over 500 stores in 20 states and a network of associate dealers in Canada.  TBC operates out of its corporate offices in Palm Beach Gardens, FL.  TBC Retail and Big O operate out of Juno Beach, Florida.  Private Brands is based in Memphis, Tennessee, and Palm Beach Gardens, Florida, and Carroll Tire is based out of Hapeville, Georgia.

3.      Upon information and belief, Defendant Geckobyte.com, Inc. d/b/a Fitment Group ("**Fitment**") is a Minnesota corporation with its principal place of business at 207 ½ E. Superior Street, Duluth, MN 55802.

4.      Upon information and belief, Defendant RFH, formerly known as "RTM Marketing Group" ("**RTM**") is a Maine corporation with its principal place of business at 5 Fundy Road, Suite 25, Falmouth, ME 04105. Upon information and belief, RTM was administratively dissolved by the Maine Secretary of State on April 23, 2012.

## Jurisdiction and Venue

5.      This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(a)(1) because the parties are all citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the complained-of acts took place in this District.

7.      This Court has personal jurisdiction over the Defendants because significant acts forming the basis of this lawsuit occurred in this District and TBC and its subsidiaries located in the State of Florida have and will suffer irreparable harm as a direct result of Defendants' intentional tortious conduct. More specifically: (1) Fitment's Chief Executive Officer and Chief Operating Officer, Tiegen Fryberger and Jeffrey Riddle, respectively, traveled to this District on behalf of Fitment to engage in negotiations with TBC that form, in part, the basis of this lawsuit; (2) significant development of the Category Management Tool took place during visits by Jeffrey Riddle, as owner and President of RTM, to this District; and (3) TBC, a corporation which directly and through its divisions and subsidiaries employs thousands of people in the State of Florida, is based in this District and has and will suffer irreparable harm if relief is not granted.

## **Background**

8.      Upon information and belief, RTM is a marketing company incorporated in 2006, largely to offer the services of owner and operator Jeffrey Riddle ("Riddle").  Prior to and alongside the events that form the basis of this lawsuit, Riddle and RTM performed general marketing research services for TBC and Carroll Tire.

9.      Tires are differentiated a number of ways, including according to dimensions, key limitations (e.g., load-bearing ability, maximum speed, traction, treadwear, and temperature resistance), and allowable range of rim widths.

10.     Over the past decade, the range of tire options available in the tire industry have proliferated in accordance with customer demand and an increase in vehicle makes and models with different fitments (parts of the vehicle to which the tire is fitted, e.g. wheel width, wheel diameter, and wheel offset).  As a result, it is more difficult for retailers to stock the appropriate numbers and types of tires and manage their inventory.

11.     In or around 2004 or 2005, TBC began looking for a software tool that would provide geographically-specific data regarding demand for specific types of tires, for the purpose of planning manufacturing needs, distribution, sales, inventory maintenance, and retail stocking across TBC's business units and subsidiaries.  This type of retailing and supply management concept is generally referred to as "category management."  TBC consulted with a number of companies that offered category management tools, but did not find a tool that fit with TBC's business structure.

12.     In or around 2007, TBC and Riddle discussed creating a software tool for TBC that would provide the functionality required for TBC's diverse operational needs.

13.     TBC and RTM entered into a Confidentiality Agreement dated March 5, 2007, wherein RTM agreed to use confidential information provided by TBC only to assist in providing marketing services to TBC and agreed to return any and all copies of materials and things provided to RTM by TBC, including any compilation made by RTM that included TBC confidential information.

14.     Since 2007, Riddle has repeatedly represented to TBC that the category management tool developed by RTM and TBC was solely and exclusively for TBC, and that RTM would not seek to sell the tool to TBC's competitors.

15.     Prior to working with TBC, RTM had no category management tool.  TBC bore all of the costs of developing the category management tool.  TBC provided RTM confidential information concerning its business plans and internal business strategies, as wells as costs, sales, inventory, and other confidential data.  TBC's analysts dictated the functionality of the tool.  Without TBC's involvement and confidential information and data, RTM would not have been able to develop the comprehensive category management tool as it exists today.

16.     In November 2007, Riddle provided TBC a final description of work.  In January, 2008, TBC paid RTM an initial fee of $117,500 to commence development.

## TBC Category Management Tool Agreement

17.     The parties' agreement related to the TBC Category Management Tool ("Category Management Tool Agreement") was never memorialized in one, fully-integrated written agreement.  The parties estimated a yearly fee, outlined payment terms, and came to agreement on annual goals, which were evidenced in presentations, oral and written communications, the parties' course of conduct, and invoices.

18.     TBC paid an initial amount of $117,500 to commence Phase I of development.

19.     During 2008 and most of 2009, RTM invoiced TBC essentially quarterly for data sets, development, hosting and management, user bandwidth, and training, and invoiced related costs as incurred.

20.     The initial launch of the TBC Category Management Tool, within TBC Retail, occurred in or around December 2008.  Over the next several years, RTM adapted the TBC Category Management Tool for use by Big O, Carroll, and TBC Private Brands.  In each case, TBC paid RTM additional significant fees to cover the cost of these enhancements.

21.     In late 2009-early 2010, the parties agreed to change the Category Management Tool Agreement term and payment schedule.  The term of the agreement would run through the end of April the following TBC fiscal year and would automatically renew if notice of non-renewal was not provided.  Expansions of the Category Management Tool requiring the acquisition of additional data sets from third parties or additional user bandwidth exceeding a certain level would be invoiced as incurred.

22.     TBC's first monthly payment under the 2010-2011 Category Management Tool Agreement was for "consulting services" for April 2010.  RTM's invoices, beginning in May 2010, included a category for additional website hosting by RTM and the monthly payment amount increased slightly.  From June 2010-March 2011, RTM stated in its invoices to TBC that the payment was under the parties' TBC Category Management Tool Agreement for "May 2010-April 2011; Automatically renewed annually."

23.     TBC's monthly payment increased under the 2011-2012 Category Management Tool Agreement.  From April 2011-June 2011, RTM stated in its invoices that the Category Management Tool Agreement was "May 2011-April 2012; Automatically renewed annually." RTM stated in its July 2011 invoice that the Category Management Tool Agreement was "April

2010-March <u>2013</u>, Automatically renewed annually" [emphasis added].  Beginning in August 2011 and through March 2012, while the invoices dropped the contract wording they maintained the same monthly rate.  Beginning in December 2011 through January 2012, RTM's invoices were issued as "RTM Marketing Group/Fitment Group."  And, in February and March 2012, the invoices for the Category Management Tool Agreement were issued by "Geckobyte Inc./Fitment Group."

24.     This course of dealing and related invoices and communications between the parties evidenced their agreement that the Category Management Tool Agreement had a one-year term that renewed automatically at the end of each annual term through the end of April, 2013.

25.     In February 2012, the Category Management Tool was expanded to include data from Canada.  TBC timely paid the invoice for the Canadian data license, which covered "3/01/12-2/28/13."

26.     Defendants did not notify TBC that they did not intend to renew the Category Management Tool Agreement for 2012-2013.  Instead, Defendants billed TBC the increased prices agreed to in 2010.  The April 2012 invoice for the Category Management Tool Agreement was issued by "Geckobyte Inc. DBA Fitment Group."  From May 2012 through July 2012, "Fitment Group" has issued the monthly TBC Category Management Tool Agreement invoices to TBC.  During this time, Defendants invoiced the agreed-to monthly amount, and TBC timely tendered payment of each monthly invoice under the Category Management Tool Agreement.  TBC has made all payments required of it under the Category Management Tool Agreement and is entitled to the full benefits of that agreement at least through July, 2012.

## Carroll Tire Agreement

27.    The TBC Category Management Tool was adapted for use by Carroll Tire.  The parties agreed to a separate payment plan, which was divided into an annual fee for website hosting and user access bandwidth and a quarterly data charge.

28.    Fitment Group/RTM Marketing Group issued the most recent annual invoice in December 2011, covering December 2011 through November 2012.

29.    TBC has made all payments required of it under the Carroll Tire Agreement and is entitled to the full benefits of that agreement at least through the end of November, 2012.

## VIP Agreement

30.    In or around 2009, RTM and TBC offered to develop a version of the Category Management Tool for VIP Parts, Tires and Service ("VIP"), a company in which TBC owns a minority interest.  RTM's fees would be included under the TBC Category Management Tool Agreement and VIP would pay TBC directly for use of the tool.

31.    TBC paid RTM to develop the VIP version of the Category Management Tool.

32.    The VIP version of the Category Management Tool launched in 2011.  All payments required under the VIP Agreement have been made and VIP is entitled to the full benefits of that agreement at least through the end of April, 2013.

## Current Use Of The TBC Category Management Tool

33.    Currently, TBC Retail, Big O, Carroll Tire, and VIP rely heavily on the TBC Category Management Tool to support their daily operations and their relationships with their customers, franchisees, and other third parties.  The TBC Category Management Tool was recently adapted for and is in the process of being launched for use by TBC Private Brands to identify current and forecasted market demand for manufacturing and sales purposes, TBC Retail uses the tool for purchasing and inventory control at its retail locations, Carroll Tire uses the tool for stocking its

distribution centers and assisting independent retailers in their purchasing decisions, and Big O uses the tool to monitor franchisees and provide market intelligence and assistance to franchisees.  RTM further customized the Big O version of the Category Management Tool so that certain of Big O's franchisees have access to the data pertinent to their market and locations.

### Defendants' Repudiation Of The
### Category Management Tool Agreement

34.     In July 2011, TBC and RTM began exploring a written agreement that would memorialize the parties' full and complete agreement with respect to the TBC Category Management Tool.

35.     In or around August 2011, the parties began exploring the possibility that TBC would acquire RTM.  Subsequently, RTM notified TBC that it had been purchased by or merged with Geckobyte.  The exact nature of the RTM and Geckobyte arrangement was not made clear, however.

36.     TBC and Defendants met in October 2011.  TBC continued to express its interest in purchasing RTM and/or certain RTM assets, but Defendants wanted TBC to purchase Fitment in its entirety at a grossly inflated price.

37.     In December 2011, Fryberger and Riddle traveled to TBC's Florida headquarters to discuss the parties' relationship and the potential acquisition.

38.     Fitment expressed disappointment during the December 2011 meeting that TBC was only interested in purchasing RTM and had no interest in acquiring Fitment at the price demanded by Fitment.

39.     Following the December 2011 meeting, Fitment, in contradiction to representations RTM had made during the parties' previous course of dealing, expressed its belief that it solely owns,

without limitation, the TBC Category Management Tool and has the right to sell the tool to others, including within the tire industry.

40.     TBC has an ownership interest in the Category Management Tool's user interface, which it co-authored.  TBC owns the data it provided to Defendants to populate the tool, which is TBC's confidential business data protected by the March 2007 Confidentiality Agreement. Moreover, TBC paid for the full cost of developing the tool, which RTM did not and could not develop on its own.  TBC also has the right to exclusively subcontract use of the TBC Category Management Tool within the tire industry, under arrangements similar to that agreed to for VIP, i.e. TBC would pay Defendants to adapt the tool for a customer and, in exchange, TBC would be entitled to collect fees from the customer.

41.     Following the unsuccessful December 2011 meeting, and in apparent and wrongful retribution for TBC's decision not to purchase Fitment in its entirety, Fitment undertook a campaign to undermine the parties' previously amicable relationship.  Fitment took over issuing the invoices to TBC and began charging TBC for services that should have been covered by the fees paid under the TBC Category Management Tool Agreement and expenses that should have been covered by Fitment as business development, for example, the December 2011 trip to discuss the terms of the parties' business relationship and the potential acquisition.

42.     In May, 2012, TBC tendered payment of amounts owed regarding the Category Management Tool, but sought to have Fitment recognize its rights in the tool and disputed certain invoices.

43.     Fitment rejected TBC's May tender of payment.

44.     TBC tendered payment again on June 1, 2012, conditioning payment of certain invoices under a reservation of rights with respect to the parties' dispute over ownership and control of the TBC Category Management Tool.

45.     Fitment rejected TBC's May tender of payment, demanded payment of all invoices issued by Fitment, including the disputed invoices and invoices not yet due.

46.     When TBC objected to payment of the disputed invoices, Fitment wrongfully and without business justification terminated access to all of the TBC Category Management Tool websites, with the exception of Carroll Tire, on June 7, 2012.

47.     By the end of the day on June 7, 2012, the detrimental impact of the wrongful access termination forced TBC to agree that it would pay all outstanding invoices under a reservation of rights regarding the parties' dispute over ownership and control of the tool.

48.     On June 19, 2012, Fryberger informed TBC that, unless TBC entered into a new written agreement regarding use of the TBC Category Management Tool by July 15, 2012, Fitment would terminate access to the tool on August 1, 2012.

49.     Fryberger forwarded a draft agreement to TBC on July 3, 2012. Fitment's proposed agreement represents an approximate 75% increase over the current 2012-2013 amount. In addition, Fitment's July 3, 2012 proposal wrongfully requires TBC to abandon all rights to and control of the category management tool without compensation therefor.

50.     Under the Category Management Tool Agreement, Defendants' invoices have reflected a consistent monthly charge with annual increases of about 3-4% each May, and with additional invoices issued periodically for additional development, training, and added user bandwidth.

51.     TBC requested additional time to review the proposed new agreement and undertake the normal and appropriate due diligence actions associated with negotiating a major business

arrangement, and noted that the parties' existing Category Management Tool Agreement was in effect at least through the end of year 2012.

52.     Fitment issued the July invoice on July 2, 2012.  On July 11, 2012, prior to TBC had an opportunity to tender payment of the invoice, Fitment issued a "credit memo" preempting any payment by TBC of the July 2, 2012 invoice.

53.     On July11, 2012, Fryberger reiterated that Fitment would terminate access on August 1, 2012 if TBC did not accede to Fitment's demands.

54.     On July 18, 2012, TBC tendered payment of all open invoices, including the July 2, 2012 invoice.

55.     On July 19, 2012, Fitment notified TBC that it was rejecting TBC's tender of payment.

## Irreparable Injury

56.     TBC estimates that it would take TBC at least 6 months to a year to create and implement a replacement category management tool if Defendants act on their wrongful threat to terminate TBC's access to the tool on August 1, 2012.

57.     If Fitment proceeds to terminate access to the TBC Category Management Tool, TBC, as well as its wholly-owned subsidiaries, franchisees, and VIP, will suffer a tremendous loss of efficiency that cannot be quantified in monetary terms, in that they will no longer have available to them the chief tool they have been using to forecast future product demand in order to be able to plan manufacturing and stock products efficiently and with as little overhead as possible.

58.     Loss of the TBC Category Management Tool would affect TBC's manufacturing needs, which must be planned out months in advance, for an untold period of time and impact its ability to assist wholesalers in tailoring the quantity and styles of tires needed for their market area, resulting in a loss of goodwill and lost sales.

59.    TBC Retail would lose its ability to monitor sales and market demand in its more than 730 company-owned stores, resulting in a loss of efficiency, business disruption, and lost sales.

60.    Carroll Tire's ability to offer value to the over 10,000 independent retailers it supports and supplies would be damaged, resulting in a loss of goodwill and lost sales.

61.    Big O's relationships with its over 500 franchisees, including franchisees that use the tool directly and those that work directly with TBC analysts, would be endangered and Big O would lose goodwill and fees associated with the franchisee's lost sales.

62.    TBC would not be able to fulfill its contractual obligations to VIP.

63.    TBC Private Brands' ongoing implementation of the tool is shadowed by the uncertainty of whether Private Brands will have the ability to profit from TBC's recent investment of development costs.

64.    Upon information and belief, Fitment is attempting to sell a category management tool derived from the TBC Category Management Tool to third parties, including to TBC's competitors, contrary to its representations to TBC that TBC would have exclusive access to the tool.  If the TBC Category Management Tool is made available to TBC's competitors, TBC will lose a significant competitive advantage currently held by TBC, while Defendants will profit from their misuse of TBC's confidential information.

## Causes of Action

### COUNT I
### Breach of Contract

65.    TBC incorporates Paragraphs 1 through 64 as if fully set forth herein.

66.    As of 2010, TBC and RTM's Category Management Agreement included the following essential terms: RTM will provide data, hosting, and the bandwidth for users to access the TBC Category Management Tool for an annual fee, which was predetermined through the end of

April 2013; TBC will be invoiced monthly in equal amounts; and the agreement will automatically renew each year absent specific notice of non-renewal. Each month's payment will be invoiced in advance with payment due within a reasonable time and TBC and RTM will jointly market the tool to the tire industry with TBC deciding to whom the tool would be offered, paying developments costs to RTM, and collecting monthly fees from customers.

67.     Riddle and later Fryberger represented to TBC in or around August 2011 that Fitment and RTM combined their business operations, including the operation, hosting, and maintenance of the Category Management Tool Agreement. Fitment recently issued a press release in April 2012 announcing the "combination" of Geckobyte and RTM to form Fitment, but stating that the combination had actually occurred in December 2010.

68.     Until June 2012, Fitment performed the services RTM agreed to provide TBC under the Category Management Tool Agreement, the Carroll Tire Agreement, and the VIP Agreement, and invoiced TBC the monthly amounts agreed to under the Category Management Tool Agreement, the amounts invoiced under the Carroll Tire Agreement, and the amounts invoiced for development of the VIP version of the TBC Category Management Tool.

69.     TBC has tendered payment in full of the monthly amounts agreed to under the Category Management Tool Agreement and the amounts agreed to under the Carroll Tire Agreement. To date, TBC has paid in excess of $1,000,000 for the development and maintenance of the tool.

70.     The Category Management Tool Agreement was automatically renewed, as evidenced by TBC's timely tender and Fitment's acceptance of payment of Fitment's March 1, 2012 Invoice.

71.     Defendants never provided notice that they did not intend to renew the Category Management Tool Agreement through April 30, 2013.

72.     On June 19, 2012, Fitment anticipatorily breached and repudiated the Category Management Tool Agreement, the Carroll Tire Agreement, and the VIP Agreement when it informed TBC that Fitment would terminate all access to the TBC Category Management Tool on August 1, 2012 if TBC did not agree to enter into a new contract by July 15, 2012.

73.     On July 11, 2012, Fitment again anticipatorily breached and repudiated the Category Management Tool Agreement when it issued a "credit memo" for payment by TBC of the July 2012 invoice, informed TBC it was terminating all access to the TBC Category Management Tool on August 1, 2012 if TBC did not agree to enter into a new contract by July 15, 2012, and provided terms to TBC that will require TBC to pay about 75% more than TBC pays under the current Category Management Tool Agreement and require TBC to abandon its ownership interest in and control of the TBC Category Management Tool.

74.     On July 19, 2012, Fitment again anticipatorily breached and repudiated the Category Management Tool Agreement when it refused payment by TBC of the July 2012 invoice.

75.     TBC cannot find or create a replacement prior to August 1, 2012 for the TBC Category Management Tool, which was initially developed over a period of more than a year and has continually undergone development since 2009 at great cost to TBC.

76.     Upon information and belief, Fitment is offering, or is planning to offer, a category management tool to TBC's competitors.

77.     TBC is willing and able to continue fulfilling its obligations under the Category Management Tool Agreement, the Carroll Tire Agreement, and the VIP Agreement.

78.     Fitment's anticipatory breach and repudiation of the Category Management Tool Agreement, the Carroll Agreement, and the VIP Agreement will irreparably harm TBC in a manner for which there is no adequate remedy at law, including but not limited to immediate and

long term disruption of its business operations, loss of market position, and loss of business reputation and goodwill with its customers, franchisees, and business partners.

79.     Fitment's anticipatory breach and repudiation of the Category Management Tool Agreement, the Carroll Agreement, and the VIP Agreement will cause TBC economic harm, including but not limited to lost sales and costs associated with replacing the TBC Category Management Tool, in an amount that is not currently ascertainable but will be proven at trial.

## COUNT II
### Promissory Estoppel

80.     TBC incorporates Paragraphs 1 through 64 as if fully set forth herein.

81.     TBC reasonably relied on RTM's promises that RTM would provide data, hosting, and the bandwidth for users to access the TBC Category Management Tool for a predetermined annual fee, TBC would be invoiced monthly in equal amounts, and the agreement would automatically renew each year.

82.     TBC reasonably relied on RTM's promises that sales of a category management tool within the tire industry would go through TBC.

83.     In reasonable reliance on RTM's promises, TBC invested significant amounts of money and time developing the TBC Category Management Tool.  TBC's operational divisions, subsidiaries, franchisees, and business partners integrated the TBC Category Management Tool into their day-to-day business operations, and the TBC Category Management Tool became essential for TBC to achieve its short term and long range business objectives.

84.     When it was belatedly informed of Fitment's combination with RTM, TBC reasonably relied on Fitment's representation that it would fulfill the promises made by RTM, including assuming RTM's obligations under the Category Management Tool Agreement and providing

data, hosting, and the bandwidth for users to access the TBC Category Management Tool under the same terms as agreed to with RTM in 2010.

85.     In reasonable reliance on Fitment's representations, TBC continued to pay the monthly amounts, allowed the annual agreement to renew, and did not seek an alternative provider or replacement category management tool.

86.     Until June 2012, Fitment fulfilled the promises made by RTM, including performing the services RTM agreed to provide TBC and invoicing TBC the agreed-to monthly amounts.

87.     TBC has paid and/or tendered the monthly amounts agreed to with Defendants.

88.     TBC cannot find or create a replacement prior to August 1, 2012 for the TBC Category Management Tool, which was initially developed over a period of more than a year and has continually undergone development since 2009.

89.     Fitment is or should have been aware that TBC cannot find or create a replacement for the TBC Category Management Tool prior to August 1, 2012.

90.     Defendants' failure to fulfill their promises will irreparably harm TBC in a manner for which there is no adequate remedy at law, including but not limited to immediate and long term disruption of its business operations, loss of market position, and loss of business reputation and goodwill with its customers, franchisees, and business partners.

91.     Defendants' failure to fulfill their promises will cause TBC economic harm, including but not limited to lost sales and costs associated with replacing the TBC Category Management Tool, in an amount that is not currently ascertainable but will be proven at trial.

92.     It would be unjust for TBC to be coerced into accepting the commercially unreasonable terms dictated by Fitment in order to avoid the irreparable damage abrupt termination of access to the TBC Category Management Tool would cause.

## COUNT III
### Tortious Interference with a Business Relationship

93.     TBC incorporates Paragraphs 1 through 64 as if fully set forth herein.

94.     As a result of the close relationship shared by the parties during development of the TBC Category Management Tool, Defendants know that TBC, including its operational divisions, and TBC's subsidiaries use the tool to provide services to third parties, including customers, franchisees, and VIP.

95.     Fitment demanded that TBC agree to a new contract solely because it knows that TBC will be placed in the untenable position of accepting Fitment's commercially unreasonable terms or losing access to the TBC Category Management Tool on August 1, 2012, which will interfere with TBC's relationships with its subsidiaries, customers, and VIP, as well as interfere with the relationships between the subsidiaries and their customers and franchisees.

96.     TBC, TBC Retail's, and Carroll Tire's customers have come to rely upon TBC's use of the tool to educate customers on market demand in their specific market and help them manage their inventories.

97.     Big O's franchisees have come to rely upon Big O's use of the TBC Category Management Tool to identify the market demand for their specific market and help them manage their inventories.  Defendants even adapted the tool so that certain Big O franchisees would have direct access to information pertinent to their markets.

98.     TBC Private Brands has invested considerable time implementing the Category Management Tool.

99.     Fitment's demand that TBC either agree to the commercially unreasonable terms or face termination of access to the TBC Category Management Tool will injure TBC's customers and its subsidiaries and their customers and franchisees.

100.    Under its agreement with VIP, TBC is obligated to provide VIP access to the TBC Category Management Tool.

101.    Fitment's demand that TBC either agree to the commercially unreasonable terms or face termination of access to the TBC Category Management Tool will cause TBC to breach its contract with VIP and injure VIP.

102.    Fitment's intentional and unjustified threat to terminate access to the TBC Category Management Tool will injure TBC, TBC Retail, Big O, and Carroll Tire in a manner for which there is no adequate remedy at law, including but not limited to immediate and long term disruption of their business operations, loss of market position, and loss of business reputation and goodwill with their customers, franchisees, and business partners.

103.    Fitment's intentional and unjustified threat to terminate access to the TBC Category Management Tool will cause TBC, TBC Retail, Big O, and Carroll Tire economic harm, including but not limited to lost sales, lost franchise fees, and/or costs associated with replacing the TBC Category Management Tool, in an amount that is not currently ascertainable but will be proven at trial.

104.    Fitment's intentional and unjustified threat to terminate access to the TBC Category Management Tool has no legitimate business justification, as TBC has made or tendered all of the payments required of it, has breached no material aspect of the Category Management Tool Agreement or the Carroll Tire Agreement, and remains willing and able to continue with the agreement.  Fitment's actions have no explanation other than as an effort to extort unreasonable terms to a new contract from TBC.

## COUNT IV

## Declaration of Irrevocable Royalty-Free License to Source Codes & Proprietary Software

105.    TBC incorporates Paragraphs 1 through 64 as if fully set forth herein.

106.    TBC requested and directed the creation of the TBC Category Management Tool, including versions thereof adapted to meet different operational needs, and its source code by Defendants.  In response to TBC' request, Defendants created the tool and source code, made it available to TBC, its subsidiaries, Big O franchisees, and VIP for their use in conducting their businesses, and—to date—has provided hosting services for the domains used to access the tool.

107.    In exchange for Defendants' services, TBC paid Defendants over $1 Million.  TBC never paid Defendants any additional fee for using the software applications which Defendants built into the TBC Category Management Tool because it was understood that the $1 million paid to Defendants included a perpetual, royalty-free license to use the software for the Web sites.

108.    Both parties intended that the TBC Category Management Tool, containing the software applications, would be made available on the Internet for TBC' use and benefit and for the use and benefit of TBC's subsidiaries, their franchisees, and TBC's business partners.

109.    There is an actual, real, substantial and justiciable controversy now existing between TBC and Defendants with respect to TBC's rights to use, reproduce, display, distribute copies, or prepare derivative works of the TBC Category Management Tool and its source code.

110.    There is also an actual, real, substantial and justiciable controversy now existing between TBC and Defendants with respect to TBC's rights to use, reproduce, display, distribute copies, or prepare derivative works of the software applications built into the source codes for the TBC Category Management Tool.

111.    Pursuant to 28 U.S.C. §§ 2201-2202, TBC is entitled to a declaration that, even if Defendant is the sole owner of the TBC Category Management Tool, source code, and software applications, TBC has an unrestricted, perpetual, royalty-free license to use, reproduce, display,

- 20 -

distribute copies, or prepare derivative works of the TBC Category Management Tool, source codes, and software applications, including for the benefit of its subsidiaries, their franchisees, and TBC's business partners, and that such licenses are irrevocable.

### Prayer for Relief

WHEREFORE, Plaintiff TBC respectfully prays that the Court:

(a)     Issue a temporary restraining order enjoining and prohibiting Defendants and all those acting in concert with them, including their related entities and their principals, directors, officers, employees, servants, agents, attorneys, successors and assigns, and anyone in privity with Defendants who receive actual notice of said order, from:

(i)     terminating or interfering with the ability of TBC, TBC Private Brands, TBC Retail, Big O, Carroll Tire, and VIP to  access the TBC Category Management Tool;

(ii)     selling, licensing, or developing, or offering to sell, license, or develop, a category management tool to any person within the tire industry absent TBC's consent pending a decision by the Court on TBC's request for a preliminary injunction;

(iii)     ordering Defendants to give TBC access to the TBC Category Management Tool, source codes, and software applications;  and

(iv)     setting a preliminary injunction hearing date and briefing schedule;

(b)     Issue a preliminary injunction enjoining and prohibiting Defendants and all those acting in concert with them, including their related entities and their principals, directors, officers, employees, servants, agents, attorneys, successors and assigns, and anyone in privity with Defendants who receive actual notice of said order, from:

(i)      terminating or interfering with the ability of TBC, TBC Private Brands, TBC Retail, Big O, Carroll Tire, and VIP to  access the TBC Category Management Tool

(ii)      ordering Defendants to give TBC access to the TBC Category Management Tool, source codes, and software applications;  and

(iii)      unilaterally selling, licensing, or developing, or offering to sell, license, or develop, a category management tool to any person within the tire industry absent TBC's consent pending a final decision on the merits of this action or legal termination of the Category Management Tool Agreement;

(c)      Issue an order permanently enjoining and prohibiting Defendants and all those acting in concert with them, including their related entities and their principals, directors, officers, employees, servants, agents, attorneys, successors and assigns, and anyone in privity with Defendants who receive actual notice of said order, from interfering with the business relationships of TBC, TBC Private Brands, TBC Retail, Big O, Carroll Tire, and VIP, including their customers and franchisees;

(d)      Issue and order permanently enjoining and prohibiting Defendants and all those acting in concert with them, including their related entities and their principals, directors, officers, employees, servants, agents, attorneys, successors and assigns, and anyone in privity with Defendants who receive actual notice of said order, from terminating the Category Management Tool Agreement, the Carroll Tire Agreement, and the VIP Agreement so long as the negotiated payments therefor continue to be paid by TBC;

(e)      Issue and order permanently enjoining and prohibiting Defendants and all those acting in concert with them, including their related entities and their principals, directors,

officers, employees, servants, agents, attorneys, successors and assigns, and anyone in privity with Defendants who receive actual notice of said order, from unilaterally selling, licensing, or developing, or offering to sell, license, or develop, a category management tool to any person in the tire industry absent TBC's consent;

(f)     Issue a declaration that, even if either of the Defendants is the sole owner of the TBC Category Management Tool, source code, and software applications, TBC has an unrestricted, perpetual, royalty-free license to use, reproduce, display, distribute copies, or prepare derivative works of the TBC Category Management Tool, source codes, and software applications, including for the benefit of its subsidiaries, their franchisees, and TBC's business partners, and that such licenses are irrevocable;

(g)     Enter judgment in favor of TBC and against Defendants on the claims asserted above by TBC;

(h)     Award TBC its actual damages and lost profits arising from Defendants' actions, treble and/or exemplary damages, pre- and post-judgment interest thereon at the highest rate allowed by law, attorney's fees at the trial level and through appeals, and costs; and

(i)     Award any such other and further relief, at law or in equity, to which TBC might show itself justly entitled.

## **Jury Demand**

TBC hereby demands a jury trial on all issues so triable.

- 23 -

## Verification

I, Gregory Ortega, state that I am _Senior Vice President/Retail Merchandising and Product Marketing_ of TBC Corporation and, being duly

authorized to do so, have read and verify the foregoing Verified Complaint for and on behalf of

TBC Corporation; that some or all of the facts and matters set forth therein are not within my

personal knowledge; that the facts and matters set forth therein have been assembled by

authorized employees and counsel of TBC Corporation; and that I am informed that the facts and

matters set forth therein are true and correct. I make this verification under penalty of perjury.

Dated: July 23, 2012

_____

Respectfully submitted,

s/ _____

Denis L. Durkin
Florida Bar No. 237132
Michael S. Vitale
Florida Bar No. 17136
Baker & Hostetler LLP
2300 SunTrust Center
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407-649-4000
Facsimile: 407-841-0168
ddurkin@bakerlaw.com
mvitale@bakerlaw.com