UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:12-CV-80780-KLR

TBC CORPORATION,

    PLAINTIFF,

vs.

GECKOBYTE.COM, INC. D/B/A FITMENT GROUP, ET AL.,

    DEFENDANTS.

**REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER/EMERGENCY PRELIMINARY INJUNCTION**

Plaintiff, TBC Corporation ("TBC"), respectfully submits its Reply in Support of its Motion for a Temporary Restraining Order/Emergency Preliminary Injunction (the "Motion") [DE 7], prohibiting Defendant Geckobyte.com d/b/a Fitment Group ("Fitment") from terminating TBC's access to the TBC Category Management Tool if TBC does not agree to unilateral terms in violation of the parties' TBC Category Management Tool Agreement ("Agreement").[1]  TBC respectfully submits that the law and facts submitted in connection with TBC's pleadings, supporting declarations and exhibits, the declarations and exhibits submitted to the Court at or before the August 17, 2012 hearing, and the arguments and evidence provided to the Court during the hearing entitle TBC to a preliminary injunction.

**I.**    **Introduction**

TBC is asking this Court for a preliminary injunction that will allow TBC continued

---

[1] It appears that RFH (formerly known as "RTM Marketing Group") ("RTM") no longer controls any part of the TBC Category Management Tool.  Without waiving its right to seek relief against RTM should discovery establish the contrary, TBC limits its request for preliminary injunctive relief to Defendant Fitment in order to narrow the issues before the Court.

access to the TBC Category Management Tool through the end of April, 2013, pursuant to the terms agreed to by the parties under the Agreement.  TBC is *not* asking the Court to decide who owns the tool or who created it.  TBC is *not* asking the Court to grant relief on TBC's claim for tortious interference.  TBC is simply asking that the status quo that existed prior to Fitment's breach be maintained until a decision on the merits of all of TBC's claims can be had.

An order maintaining the status quo as it existed prior to Fitment's breach of the Agreement is necessary because, as Fitment has demonstrated, it has no intention of living up to its obligation to provide services through April 30, 2013.  Fitment has offered to make the service available for September at a unilaterally-established price that is twice the agreed-to amount.  Fitment's "offer" is not good enough.  Fitment has given no guarantee that it will "keep the light on" after September, let alone through the contract period.  As a result, TBC cannot predict when it will need to provide a replacement tool.  It cannot devote the necessary resources to training users on the tool, when there is no assurance that users will be able to rely on use of the tool for any period of time.  Without having the certainty afforded by compliance with the agreed-to terms, the harm that necessitated TBC's motion in the first place remains.

By contrast, **Fitment has not identified any harm it would suffer** if it were ordered to provide services through the end of the Agreement term.  Much of the argument and evidence asserted by Fitment is unrelated to the issue of whether the preliminary injunction requested by TBC should issue.  Many of the "facts" recited by Fitment are incorrect and oftentimes contradicted by documents created by Fitment itself.  Given Fitment's failure to meaningfully challenge the evidence submitted by TBC, TBC is likely to succeed on the merits of its claim.  The irreparable harm faced by TBC greatly exceeds any as-yet unidentified damage to Fitment.  For these reasons, TBC respectfully requests that the Court issue a preliminary injunction.

## II. TBC Is Likely to Succeed on the Merits

### A. TBC Has Sufficiently Established a Valid Contract and Fitment's Breach Thereof

Fitment denies categorically that anything other than a month-to-month agreement existed under which it provided development, maintenance, and hosting services for the TBC Category Management Tool to TBC. These categorical denials, however, are not corroborated by any documents and are contradicted by the weight of the evidence. Fitment's attempts to portray the Agreement as indefinite also fall flat when confronted with its own words and deeds. The fact that the Agreement is not found in a fully-integrated written memorialization does not preclude the relief requested by TBC. Under very similar circumstances, the court in *National Auto Lenders, Inc. v. Syslocate, Inc.*, 753 F.Supp. 2d 1233 (S.D. Fla. 2010) granted a preliminary injunction requiring continued performance where the parties' course of dealing established an agreement to continue to provide services and not block access to website.

#### 1. Fitment Cannot Explain the Invoice Language

The invoices issued by Fitment and its predecessor, contemporaneous communications, and the parties course of dealing all corroborate the material terms of the Agreement, namely, the scope of the work to be provided, the term of the Agreement, the payment amount, and the payment terms. [Invoices, DE 8-5; Email from J. Riddle with attachment, DE 8-6; Email from C. Bedell with attachments, DE 8-7]  Other than its general denial that a contract exists, the only facts raised by Fitment are an uncorroborated statement by Mr. Fryberger that the invoices issued by RTM and then Fitment for over a year do not really mean what they say and complaints regarding how TBC paid Fitment's invoices during 2012. Neither of these issues detracts from the definiteness of the Agreement.

Mr. Fryberger attempts to explain that the unequivocal references to the automatically

renewable annual agreement referred to a "wrapper" (header and navigation bar on the website) that was called "RWeb" by Defendants. [Fryberger Decl., DE 43-1, ¶¶8-10.]  The explanation concocted by Mr. Fryberger is starkly at odds with the language used in the invoices.  Mr. Fryberger indicates the $225 RWeb charge was for "development and maintenance" of the "wrapper."  "Wrapper" is not a technical term in website development.  What Fitment describes as the wrapper is essentially the graphical interface that resides at a URL and provides the visual representation of the application data – it does not itself perform any function whatsoever.  Yet, the "services rendered" are described in the invoices as "RWeb, Development, Hosting, Maintenance, Security, and Updates."  The "wrapper" is not "developed," does not relate to the hosting of the application, and does not require maintenance, security, or updating.  Rather, those are the services identified as the services provided by Defendants in exchange for the monthly amounts paid under the Agreement.  [Invoices, DE 8-5; Email from J. Riddle with attachment, DE 8-6; Email from C. Bedell with attachments, DE 8-7]  Mr. Fryberger's explanation that this language all refers to a basic website header and navigation bar simply cannot be reconciled with the actual language used in the invoices.  Moreover, there is nothing about the formatting of the invoices that associates the language regarding contract term and renewal with only a portion of the listed services.  Mr. Fryberger's claim also is at odds with the additional invoice issued by Fitment in July 2011, which states "Consulting service contract increase for the year 2011, which wasn't previously invoices for the months of April 2011-July 2011 at $[redacted] per month."  [DE 8-5, p. 17.]

      Ultimately, Mr. Fryberger's explanation does not make sense.  Why would the parties agree to a three year, annually renewable agreement for a non-functional, easily replaceable aspect of the tool?  Mr. Fryberger was not around at the time the 2010 Agreement was reached.

Once Mr. Fryberger became actively involved in August 2011, the language referring to the Agreement in the invoices disappeared.  Hindsight, in this case, is 20/20.

### 2. Fitment's Own Actions and Documents Undermine Its Claim that Payment Terms Are Indefinite

Both Mr. Fryberger and Mr. Riddle express confusion over TBC's alleged 2012 change in payment method and timing.  [Riddle Decl., DE 31-2, ¶28; Fryberger Decl., DE 43-1, ¶10]  Fitment would do better to look to its own actions for an explanation.  First, Fitment's invoices for the monthly amounts payable under the Agreement, starting in April 2012, did not specify a method of payment.  [*See* DE 8-5, pp. 26-29.]  Throughout the initial stages of the parties' agreement, RTM did not always issue an invoice on the first of the month and many times sent the invoice on a different date.  The invoices indicate payment terms of 30 days or, sometimes, "due on receipt."  TBC always paid undisputed invoices within a reasonable time of receipt according to its standard practice of 45 days net, which Mr. Riddle testifies was acceptable until the invoicing dispute of May-early June 2012.  [Riddle Decl., DE 31-2, ¶28].

Furthermore, in 2012, the name of the vendor issuing the invoices changed from RTM to Fitment, which caused confusion.  TBC had a preexisting relationship with Fitment, and the agreed-to payment terms were TBC's standard 45 days net.  Like the TBC Category Management Tool Agreement monthly invoices, those invoices also were inconsistent on the preferred method of payment.  Starting in March 2012, Fitment indicated that the invoices were "payable via check or ACH bank payment" or specified no method of payment.

Clearly, the exact method and time of payment were not material.  The parties' course of dealing shows that payment of undisputed invoices within a reasonable time, i.e. TBC's standard 45 days net, was acceptable.  Fitment's after-the-fact objections to the time and manner of payment do not render the Agreement's payment terms indefinite.

### B.     TBC Will Suffer Irreparable Harm Absent an Injunction

#### 1.     TBC Did Not Delay Seeking Relief

Fitment's argument rests on factual conclusions made in the Report and Recommendation denying in party TBC's request for a TRO which, respectfully, are not accurate.  The Report and Recommendation concludes that Fitment first threatened to terminate access in December 2011, citing the Declaration of Gregory Ortega in Support of TBC's Emergency Motion for a Preliminary Injunction/Ex Parte TRO ("Ortega Decl. Re TRO") at Paragraph 8.  [*See* DE 19, p. 3]  Paragraph 8 of the Ortega Declaration, however, references a meeting in December 2011 during which the parties unsuccessfully discussed the purchase of Fitment by TBC ("Purchase Negotiations").  [*See* DE 8-4, ¶8.]  Fitment itself argues in its Motion to Dismiss for Lack of Personal Jurisdiction [DE 31] that the December 2011 meeting did not concern either party's performance of the Agreement.  The Ortega Declaration then goes on to summarize a series of events that took place over the next seven months, culminating in Fitment's June 19, 2012 threat to disable access to the TBC Category Management Tool.  *Id.*  The Ortega Declaration does not state that Defendants first threatened to terminate access in December 2011.  [*Id.*; Ortega Decl. Re Stay, DE 42-1, ¶3.]  As set forth in the Verified Complaint, the parties' December 2011 meeting concerned the relationship between the parties given RTM's apparent purchase by Fitment and the purchase of Fitment/RTM by TBC.  [DE 1, ¶¶37-38; *see also* Ortega Decl. Re Stay, DE 42-1, ¶3.]  Throughout the Purchase Negotiations, the parties continued to operate under the Agreement, with Defendants continuing to issue regular monthly invoices in the agreed-to amount until July 2012.  [*See* Verified Complaint, DE 1, ¶¶23-26; Invoices, DE 8-5, pp. 23-29.]  Also, the invoice dispute in May-June 2012 was not over "increased invoices," Fitment did not increase the monthly amounts it was charging under the Agreement.  *Id*.  The dispute was over ancillary issues, such as extra invoices and Fitment's

announcement that it might offer the tool to TBC's competitors, not termination of the underlying service agreement. [Ortega Decl. Re Stay, DE 42-1, ¶3.] There was no material breach of the Agreement at the time, nor did Fitment threaten to terminate the Agreement.

Also, the Court does not address directly the issue of when TBC's cause of action accrued. The deteriorating relationship between the parties would not have been a sufficient basis for TBC filing for anticipatory breach of contract. In order for the doctrine of anticipatory repudiation to apply, "the refusal must be distinct, unequivocal, and absolute." *Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. 3d DCA 1980). The parties' earlier disagreements over ancillary issues were not a repudiation of the Agreement, as shown by the fact that Fitment continued to issue the regular monthly invoices at the agreed-to amounts and TBC tendered payment of the same. Even Fitment's June 19, 2012 threat to terminate the agreement unless a new agreement was negotiated, as it was followed by the parties' continued negotiations and Fitment's issuance of the regular July 2, 2012 invoice (for August services) at the agreed-to amount, does not demonstrate a "distinct, unequivocal, and absolute" refusal to perform its obligations. *See Mori*, 380 S. 2d at 463. Fitment's repudiation was not "distinct, unequivocal, and absolute" until July 11, 2012, when Fitment issued the "credit memo" and stated that it was shutting off service on August 1, 2012. [Ortega Decl. Re Stay, DE 42-1, ¶3.] Even if the action did accrue on June 19, 2012, it was reasonable for TBC to attempt to negotiate a private resolution of the dispute with Fitment. *Id*.

Accordingly, TBC did not wait an unreasonable amount of time before seeking injunctive relief.

### 2. The Harm to TBC Cannot Be Remedied by Damages

If Fitment is not enjoined and terminates access, as it has indicated it will do, TBC, as well as its wholly-owned subsidiaries, franchisees, and VIP, will suffer a tremendous loss of

efficiency that cannot be quantified in monetary terms, in that they will no longer have available to them the chief tool they have been using to forecast future product demand in order to be able to plan manufacturing and stock products efficiently and with as little overhead as possible, specifically:

- Loss of the TBC Category Management Tool would affect TBC Private Brand's planning of its manufacturing needs, which must be determined months in advance, for an untold period of time and impact its ability to assist wholesalers in tailoring the quantity and styles of tires needed for their market area, resulting in a loss of goodwill and lost sales.
- TBC Retail would lose its ability to monitor sales and market demand in its more than 730 company-owned stores, resulting in a loss of efficiency, business disruption, and lost sales.
- Carroll Tire's ability to offer value to the over 10,000 independent retailers it supports and supplies would be damaged, resulting in a loss of goodwill and lost sales.
- Big O's relationships with its over 500 franchisees, including franchisees that use the tool directly and those that work directly with TBC analysts, would be endangered and Big O would lose goodwill and fees associated with the franchisee's lost sales.
- TBC would not be able to fulfill its contractual obligations to VIP.

[Verified Complaint, DE 1, ¶¶33, 56-63]

Fitment supposes that these harms can be remedied by damages, yet is silent as to how one can reliably calculate monetary damages based on a loss of efficiency. The case cited by Fitment, *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983), does not stand for the proposition that the loss of efficiency resulting from inability to use a major planning tool is somehow compensable by damages. *Jefferson County* refers to the loss of "money, time, and energy" spent on litigation in the absence of a stay. *Id.* at 1520.

Temporary, month-to-month access fails to alleviate the harm TBC aims to avoid by moving for a preliminary injunction, which is to relieve the uncertainty cast upon TBC's

business operations as a result of Fitment's repudiation of the TBC Category Management Tool Agreement. TBC cannot replace the tool overnight and needs to plan how it will allocate resources to developing a replacement tool. [Ortega Decl. Re: Stay, DE 42-1, ¶2.] As it stands, TBC will have to expend significant non-monetary resources in training personnel and integrating use of the tool over the next couple of months if it wants to reap the benefits of its recent investments in the tool. *Id*. During the first part of the year, significant enhancements to the VIP tool were made and the TBC Private Brands version of the tool was launched. *Id*. Use of the tool by TBC and the third parties utilizing the tool through TBC, including in particular the recent enhancements, requires training. *Id*. If Fitment is permitted to abruptly discontinue service on October 1, the training would be rendered useless. *Id*. Moreover, TBC has obligations to the third parties who rely on TBC's access to the tool. *Id*. TBC's inability to provide those parties with reassurances of continued access through the term of the Agreement damages its relationships with those parties. *Id*. Accordingly, a month-to-month arrangement does not maintain the status quo, which is what TBC is seeking by moving for a preliminary injunction to enforce the parties' existing Agreement.

### C.     The Threatened Injury to TBC Outweighs Any Damage to Defendants

There is no threat of injury to Defendants if an injunction is issued. TBC will continue to pay the agreed-to monthly amount. The only thing Defendants have to do is to leave the servers plugged in and running properly and continue the data feeds. Fitment claims that an injunction will allow TBC to "reverse engineer" the TBC Category Management Tool. It is not clear what Fitment means by "reverse engineering." Reverse-engineering any product is not, in and of itself, wrong. TBC has not requested the software code and, indeed, Fitment states that it has never provided the code to TBC. Fitment has not identified any proprietary information that TBC possesses that would give it an unfair advantage in developing a new tool. Accordingly,

any development of a new tool is not improper but, rather, necessary for TBC to mitigate its damages. Moreover, granting an injunction will not make TBC's development of a replacement tool any more or less likely. There is no causal relationship between Fitment's claimed harm and TBC's requested injunction.

### D. The Injunction Would Not Be Adverse to the Public Interest

The public has an interest in ensuring that contracts are enforceable and in not allowing commercial enterprises to be coerced into accepting non-negotiable, commercially unreasonable terms.

### E. Bond

Fed. R. Civ. P. 65(c) provides for the posting of security "that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" *BellSouth Telecom., Inc. v. MCIMetro Access Trans. Servs. LLC*, 425 F.3d 964, 970-71 (11th Cir. 2005) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)) (citation and quotation marks omitted). TBC is willing to continue paying the agreed-to monthly amount under the TBC Category Management Tool Agreement. Accordingly, Defendants would suffer no loss if it is forced to abide by the terms of the agreement. It is TBC's position, accordingly, that no bond is needed. If the Court deems a minimal bond is appropriate, it should be for no more than $500.

## III. Conclusion

For the reasons stated above and based on such further evidence and argument submitted at or before the August 17, 2012 hearing, Plaintiff TBC respectfully prays that the Court issue a preliminary injunction as requested in TBC's Verified Complaint.

Respectfully submitted,

*s/ Denis L Durkin*
Denis L. Durkin
Florida Bar No. 237132
Michael S. Vitale
Florida Bar. No. 17136
Baker & Hostetler LLP
2300 SunTrust Center
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407-649-4000
Facsimile: 407-841-0168
ddurkin@bakerlaw.com
mvitale@bakerlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2012, I electronically filed the foregoing *Reply in Support of Motion for Temporary Restraining Order/Emergency Preliminary Injunction* with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

John F. Mariani
Shutts & Bowen, LLP
jmariani@shutts.com
Counsel for Geckobyte.com, Inc.

Thomas H. Shunk
tshunk@bakerlaw.com
*Pro Hac Vice* counsel for Plaintiff

Jeffrey T. Williams
jwilliams@bakerlaw.com
*Pro Hac Vice* counsel for Plaintiff

*s/ Denis L Durkin*
Denis L. Durkin

022426, 000004, 601506528.5